IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRACI SUE REIDENBACH, | ) | Case No. 5:21-cv-1880 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Traci Sue Reidenbach, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Titles II of the Social Security Act.  Reidenbach challenges the Administrative Law Judge's ("ALJ") negative findings on the basis that the ALJ should have ordered a consultative opinion to evaluate over six months' worth of medical records post-dating the most recent opinion on record.  However, because the post-opinion evidence showed overall improvement in Reidenbach's condition and was not of the kind that would necessitate an opinion to assess functional limitations, the ALJ applied proper legal standards in making her residual functional capacity ("RFC") determination.  Thus, the Commissioner's final decision denying Reidenbach's application for DIB must be affirmed.

## I.        Procedural History

On June 13, 2019,[1] Reidenbach applied for DIB.  (Tr. 178, 185).[2]  Reidenbach alleged that she became disabled on January 2, 2018 due to: "1. Bursitis of [the] left hip; 2. Blown out knees; 3. Severe depression; 4. Osteoarthritis; 5. High blood pressure; 6. Heart failure with reduced ejection fraction; 7. Coronary artery disease; 8. Mild myocardial infarction; 9. Anxiety; [and] 10. Hypocalcemia."  (Tr. 178, 185, 212).  The Social Security Administration denied Reidenbach's application initially and upon reconsideration.  (Tr. 75-88, 90-102).  Reidenbach requested an administrative hearing.  (Tr. 124).

On June 24, 2020, ALJ Amanda Knapp heard Reidenbach's case and denied Reidenbach's application on September 29, 2020.  (Tr. 15-27, 32-74).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Reidenbach could do light work, except that:

> [Reidenbach] may stand and/or walk, with normal breaks, for up to four hours in an eight-hour workday; [she] may occasionally balance, stoop, kneel, crouch, crawl, may frequently climb ramps and stairs, but may never climb ladders, ropes or scaffolds; [Reidenbach] may work in a setting with no more than frequent exposure to humidity, extremes of temperature, fumes, odors, dust, gases, and poor ventilation; [she] must avoid all exposure to workplace hazards such as unprotected heights; [she] can perform complex tasks, in a work setting free of production rate pace or strict production quotas, involving no more than occasional interaction with others, but which does not include tasks involving sales, arbitration, negotiation, confrontation, collaboration, conflict resolution, or responsibility for the safety or welfare of others, which setting contemplates only occasional changes in workplace tasks and duties, explained in advance and implemented gradually.

(Tr. 20).

---

[1] Although the application itself says June 14, 2019, the administrative decisions cite June 13, 2019 as the date of filing.  Neither party disagrees with June 13, 2019.  ECF Doc. 10 at 3; ECF Doc. 12 at 2.  The court therefore assumes June 13, 2019 to be the date on which Reidenbach applied for DIB.
[2] The transcript appears in ECF Doc. 7.

Based on vocational expert testimony that a hypothetical person with Reidenbach's age, experience, and RFC could perform other work, the ALJ determined that Reidenbach was not disabled and denied her claim. (Tr. 26-27).  On July 29, 2021, the Appeals Council declined further review, rending the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On October 3, 2021, Reidenbach filed a complaint to obtain judicial review.  ECF Doc. 1.[3]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Reidenbach was born on January 8, 1972 and was 45 years old on the alleged onset date. (Tr. 75, 178).  Reidenbach had an 11th-grade education and was a "state-certified nursing assistant."[4]  (Tr. 42, 213).  She had past work as a cashier, nursing assistant, and home aid, which the ALJ determined she was unable to perform.  (Tr. 25, 43-45, 213).

### B.    Relevant Medical Evidence

Because Reidenbach only claims error in how the ALJ considered her heart and knee impairments, the court will only summarize the medical evidence relevant to those two impairments.  *See* ECF Doc. 10 at 8-12.

On February 13, 2019, Reidenbach presented to Aultman Hospital's emergency department with dizziness, insomnia, whole-body tingling sensation, twitching, hematuria, vomiting, and a sore throat.  (Tr. 391, 394).  She also reported seeing "spots" in her field of vision.  (Tr. 391).  Reidenbach rated her pain as 2/10 in severity and stated that her symptoms began three days before.  *Id.*  On physical examination, Reidenbach had unremarkable results

---

[3] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 8.
[4] The court takes judicial notice that the actual name for such a position is "state-tested nursing assistant" or STNA.  (Tr. 213.)

except that she appeared tremulous.  (Tr. 392).  She was discharged in stable condition the same day with diagnoses of insomnia, shakiness, and sore throat.  (Tr. 393).

On February 14, 2019, Reidenbach visited Nardine Zakhary, DO, to follow up on her emergency room visit.  (Tr. 362).  On physical examination, Reidenbach had unremarkable results except slightly elevated blood pressure (138/94).  (Tr. 362-63).  During a follow-up appointment on February 24, 2019, Reidenbach's blood pressure was 132/86; her physical exam results were otherwise unremarkable.  (Tr. 360-61).

On February 26, 2019, Reidenbach presented to Aultman Hospital's emergency department with chest pain.  (Tr. 277).  She was mildly short of breath and reported chest discomfort rated at 5-6/10 in severity, with radiation into her left harm.  *Id.*  An initial EKG was unremarkable and Reidenbach's symptoms were alleviated with sublingual nitroglycerin.  *Id.* However, Reidenbach's symptoms returned, and a second EKG showed ST elevation throughout the anterolateral leads.  (Tr. 277-78).  Reidenbach underwent a heart catherization, the results of which showed: (i) 100% stenosis of the left anterior descending artery, which was stented; (ii) 20% stenosis of the right coronary artery; and (iii) 50% stenosis of the left circumflex.  (Tr. 322-24).  An echocardiogram showed a reduced ejection fraction of 30-35%, with akinesis of the apical anterolateral and apical myocardium and hypokinesis of the anterior, anterolateral, and apical myocardium.  (Tr. 286-87, 299-300).  Post-stent placement, Reidenbach was "medically stable and doing very well."  (Tr. 287).

On March 1, 2019, Reidenbach was discharged in stable condition with diagnoses of: (i) acute anterior wall ST elevation myocardial infarction; (ii) coronary atherosclerotic heart disease; (iii) significant tobacco history; and (iv) obesity.  (Tr. 274-75).  Her physical examination results on discharge were unremarkable.  (Tr. 275-76).  Reidenbach was prescribed

4

acetaminophen, aspirin, atorvastatin, clopidogrel, lisinopril, metoprolol, and nicotine patches.  *Id.*
She was further instructed to lift no more than five pound for seven to ten days.  *Id.*

On May 4, 2019, Reidenbach returned to Dr. Zakhary to follow up on her hospital stay.
(Tr. 357).  Reidenbach reported no symptoms and her physical exam results were unremarkable.
(Tr. 357-58).

On March 25, 2019, Reidenbach established care with the Aultman Medical Group
Cardiovascular Consultants ("AMGCC").  (Tr. 472).  Reidenbach reported that, following her
discharge from the hospital, she'd had one episode of chest pain unrelated to exertion and
occasional episodes of shortness of breath when lying down.  *Id.*  However, she reported that she
was able to perform activities of daily living without limitation.  *Id.*  On physical examination,
Reidenbach had unremarkable results.  (Tr. 474).  The attending physician noted that from a
cardiological standpoint Reidenbach was "doing well."  *Id.*

On April 30, 2019, Reidenbach returned to AMGCC, reporting that she felt "okay,"
except that she had occasional "flip-flops" in the evening, after she took Lipitor.  (Tr. 379).
Reidenbach otherwise reported no symptoms.  (Tr. 379, 381).  On physical examination, she had
unremarkable results.  (Tr. 381-82).  The attending physician noted that Reidenbach's atrial
fibrillation was "Stable."  (Tr. 382-83).

On May 15, 2019, Reidenbach underwent a transthoracic echocardiography.  (Tr. 373).
Her results showed mildly reduced systolic function of the left ventricle (45-50% stenosis) with
mild diffuse hypokinesis.  *Id.*

On June 11, 2019, Reidenbach reported to AMGCC for a follow-up, reporting 30-minute
episodes of chest pain that were relieved with rest and sometimes related to exertion.  (Tr. 463,
465).  She further reported that she could do activities of daily living but with limitations.  (Tr.

463).  On physical examination she had unremarkable results except obesity.  (Tr. 465).  The attending physician ordered a nuclear stress test, noting that Reidenbach was "doing well."  (Tr. 463, 465).

On June 27, 2019, Reidenbach underwent a nuclear stress test.  (Tr. 367).  Her results showed no definitive evidence of ischemia or infarction and normal left ventricle systolic function (ejection fraction of 56%) with mild septal hypokinesis.  *Id.*

On August 9, 2019, Reidenbach visited Jeffrey Cochran, DO, reporting worsening knee pain.  (Tr. 493).  Reidenbach reported constant knee pain, with popping, locking, and giving way, which had been worsened by her cardiological rehabilitation.  *Id.*  She treated her pain with Tylenol.  *Id.*  On physical examination, Reidenbach had tenderness of the medial joints and mild effusion.  *Id.*  X-ray examination showed mild degenerative changes of the medial compartment of the knee.  *Id.*  Dr. Cochran diagnosed Reidenbach with degenerative joint disease and referred Reidenbach to physical therapy.  (Tr. 493-94).

On September 5, 2019, Reidenbach returned to AMGCC for a follow-up, reporting that she'd "been doing fairly well."  (Tr. 585).  She reported that she exercised for at least 30 minutes per day and played with her grandchildren daily, all without symptoms.  *Id.*  On physical examination, Reidenbach had unremarkable results except obesity.  (Tr. 586).  The attending physician noted that Reidenbach's condition was "Stable."  (Tr. 585).

On January 20, 2020, Reidenbach underwent knee joint replacement surgery of her left knee due to degenerative arthritis.  (Tr. 524).  Before surgery, she had "significantly limited" joint range of motion due to pain and joint stiffness, which was aggravated by activities of daily living and not relieved by conservative treatment.  *Id.*  And preoperative x-rays showed

6

"marginal osteophytes, absence of cartilage space and subchondral bone thickening with joint deformity."  *Id.*

On January 23, 2020, Reidenbach underwent a physical therapy evaluation.  (Tr. 557). Reidenbach reported that her knee symptoms had been present for a year before her surgery.  *Id.* She reported her pain on evaluation as 6-7/10 in severity.  *Id.*  She further reported that she was unable to do activities of daily living without pain or walk without an assistive device.  *Id.*  On physical examination, she had decreased lower extremity active range of motion: (i) 125° right knee flexion and 80° left knee flexion; and (ii) 0° right knee extension and 20° left knee extension.  (Tr. 559).  She also had diminished left lower extremity strength: (i) 3/5 quad and iliopsoas strength; (ii) 4-/5 hamstring strength; (iii) 4/5 plantarflexion strength; and (iv) 5/5 dorsiflexion strength.  *Id.*

Reidenbach attended physical therapy sessions from January 23 until March 5, 2020.  *See* (Tr. 497-522, 526-29, 539-61).  On March 5, 2020, Reidenbach was discharged from physical therapy after completing all physical therapy goals: (i) increased active left knee range of motion to greater than or equal to 0-120°; (ii) increased left knee strength to greater than or equal to 4+/5; (iii) ambulation without an assistive device or pain; and (vi) independence with home exercises.  (Tr. 514).  Her pain had reduced to between 3/10 and 7/10 in severity.  (Tr. 512).

Meanwhile, on February 14, 2020, Reidenbach visited Robert Kepley, MD, reporting pain, joint swelling, muscle weakness, stiffness, numbness, and tingling.  (Tr. 543, 545). Reidenbach rated her pain at 7-8/10 in severity, which she treated with Oxycodone.  *Id.*  She ambulated with a cane.  (Tr. 543).  On physical examination, Reidenbach had 115° left knee flexion and 0° left knee extension.  (Tr. 545).

On March 10, 2020, Reidenbach visited John Paulowski, MD, reporting chest and jaw discomfort and episodes of shortness of breath, orthopnea, dyspnea, and dizziness/syncope.  (Tr. 582).  She stated that these symptoms were "similar to heart attack pain but less severe.".  *Id.* She also reported that her activity level was at "baseline."  (Tr. 582)*.*  On physical examination, Reidenbach had unremarkable results.  (Tr. 582-83).  A cardiomyopathy showed that Reidenbach's systolic function was normal (ejection fraction between 55-60%).  (Tr. 582). Dr. Paulowski noted that Reidenbach's reported symptoms were "somewhat concerning" but stated that, after review of her objective testing, he would continue her on her current treatment regimen and ordered cardiac catherization.  *Id.*

On March 18, 2020, Reidenbach underwent a heart catherization, the results of which showed acute coronary syndrome.  (Tr. 601).  Specifically, Reidenbach had mildly to moderately reduced left ventricle systolic function (35-40% ejection fraction) and a mid-vessel lesion in her left circumflex, with 95% stenosis.  *Id.*  The interpreting physician noted that the lesion was a "likely culprit for the patient's anginal symptoms and clinical presentation."  *Id.*  Reidenbach underwent an angioplasty and stent placement.  (Tr. 600).

On March 19, 2020, Reidenbach was discharged from the hospital in stable condition.  *Id.* Her objective examination results on discharge were unremarkable.  (Tr. 601-02).  The attending nurse practitioner stated that she was "optimistic with reperfusion [Reidenbach] will regain function."  (Tr. 601).

On April 14, 2020, Reidenbach attended a telehealth appointment with AMGCC, reporting one episode of chest discomfort on April 1, 2020 which resolved with nitroglycerin. (Tr. 577).

### C.    Relevant Opinion Evidence

On August 28, 2019, Lynne Torello, MD, evaluated Reidenbach's physical capacity based on a review of the medical record.  (Tr. 83-84).  Dr. Torello found that Reidenbach could: (i) lift 20 pounds occasionally and 10 pounds frequently; and (ii) stand/sit/walk for more than 6 hours in an 8-hour workday.  *Id.*

On September 22, 2019, Gail Mutchler, MD, concurred with Dr. Torello's opinion on Reidenbach's exertional limitations.  (Tr. 96-97).  However, Dr. Mutchler additionally found that Reidenbach could: (i) occasionally kneel and climb ladders/ropes/scaffolds; (ii) frequently crouch, crawl, stoop, and climb ramps/stairs; and (iii) balance without limitation.  (Tr. 97).

### D.    Relevant Testimonial Evidence

Before receiving testimony, the ALJ asked Reidenbach's attorney representative whether there were any outstanding medical records.  (Tr. 39).  Reidenbach's attorney indicated there were five outstanding records from Cardiology Associates of Canton, which he expected could be obtained within 14 days.  *Id.*  The ALJ indicated she would keep the record open for two weeks to receive the additional evidence, noting that Reidenbach could request additional time if necessary.  *Id.*

Reidenbach testified that the main reason she could not work was because of her heart, knees, and hips.  *See* (Tr. 49, 57).  She testified that she had recurrent (three times per week) chest pain with palpitations and jaw pain, for which she was taking nitroglycerin once per day.  (Tr. 50-51).  But after she took the nitroglycerin, she got "serious" headaches, which she was told to treat by lying down.  (Tr. 51).  After 20 minutes, her headaches would pass.  *Id.*  She testified that she had chest pain when bending over.  (Tr. 50, 52).  And she testified that her

medication caused dizziness if she moved too quickly, which had caused her to fall the previous week. *Id.*

Reidenbach testified that since her knee surgery, "it's [been] going pretty good," though she could not squat or bend in certain directions and she used a cane for stability. (Tr. 53-54, 57). She testified that she still needed to have surgery in right knee, which suffered from similar but less severe symptoms than her left. (Tr. 53-55). Following the surgery on her left knee, her right knee symptoms had been worsening because she was "babying" her left knee. (Tr. 54-55). She was not on any treatment for her right knee because "[d]octors really don't want to even work on me because of the blood thinners and all the heart medicine and the heart trouble." (Tr. 55).

Reidenbach testified that, because of her impairments: (i) she had to use a shower chair because she could not tolerate prolonged standing; (ii) she could not bend; (iii) she could not lift her leg high enough to get in and out of a bathtub; (iv) she avoided stairs because she was "shaky" with all her medication; and (v) her husband did all the household chores. (Tr. 56, 60). She also struggled to play with her grandson because she could not get down on the floor. (Tr. 59). And doctors have told her she couldn't lift anything over five pounds. (Tr. 60). Reidenbach testified that she spent the day pacing around the house and sitting down because of her medication-induced-lightheadedness. (Tr. 61, 64-65).

Vocational expert ("VE") Millie Droste testified that a hypothetical person with Reidenbach's age, experience, and the ALJ's proposed limitations would be able to perform Reidenbach's past work as a cashier checker. (Tr. 66-67). The VE testified the individual could also work as a marker, cleaner/housekeeper, toll collector, and routing clerk. (Tr. 68-69). If the individual were limited to no more than four hours of standing/walking and occasional postural

10

limitations, the VE testified the individual could work at the sedentary exertion level as a document preparer, addresser, and cutter/paster.  (Tr. 70-71).  If the individual required the use of a cane, the VE testified that there were no jobs the individual could perform.  (Tr. 72).  The VE testified that an employer would not tolerate more than 9% off-task time (37-38 minutes over the normal length of scheduled breaks) or more than 6 absences per year.  (Tr. 71-72).

No new records were submitted after the ALJ hearing.

## III.   Law & Analysis

### A.   Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of

11

a substantial right.").  And the court will not uphold a decision when the Commissioner's

reasoning does "not build an accurate and logical bridge between the evidence and the result."

*Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78

F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot

determine if it was discounted or merely overlooked.").

    **B.**       **Step Four: RFC Determination**

       Reidenbach argues that the ALJ failed to apply proper legal standards in analyzing the

functional limitations attributable to her knee and cardiovascular impairments.  ECF Doc. 10 at

8-12.  As to the former, Reidenbach argues that the medical record of her right knee impairment

was so underdeveloped that it was impossible for the ALJ to have determined what functional

limitations were attributable to her right knee osteoarthritis without an opinion.  ECF Doc. 10 at

10.  As to the latter, Reidenbach argues that the ALJ should have obtained a consultative opinion

to aid in assessing Reidenbach's functional limitations following her second heart attack.  ECF

Doc. 10 at 10.  Without such an opinion, Reidenbach argues that the ALJ was left to speculate on

the limiting effects of her heart attack, as indicated by: (i) the ALJ's reliance on "normal" heart

rate and rhythm treatment notes, even though those same sorts of objective exam findings were

also present before the first heart attack; and (ii) the ALJ's lay opinion that she would have a

"good outlook" after her second stent placement.  ECF Doc. 10 at 10-11.

       The Commissioner responds that the ALJ didn't need to obtain a consultative evaluation

because the ALJ's RFC determination was supported by substantial evidence.  ECF Doc. 12 at

11-12.  The Commissioner argues that, as the party with the burden, Reidenbach was responsible

for any evidentiary gaps regarding her knee issues.  ECF Doc. 12 at 10-11.  And the

Commissioner argues that he ALJ reasonably determined that no additional evidence was necessary. ECF Doc. 10 at 12-13. In her reply brief, Reidenbach argues that the burden is on the ALJ to develop a claimant's complete medical history. ECF Doc. 13 at 1.

Because of the inquisitorial, non-adversarial nature of Social Security proceedings, ALJs have a basic obligation to develop the record. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000); *see also Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 397 (6th Cir. 2010). This duty to develop the record is balanced against the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)). The regulations address this tension by (i) imposing upon the claimant the burden of proof and (ii) imposing upon the ALJ a duty to make reasonable efforts to develop a sufficient record upon which to make a disability determination. *See* 20 C.F.R. §§ 404.1512(a)-(b), 404.1545(a)(3).

The regulations give the ALJ the discretion to determine how to resolve any evidentiary gaps in the record. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010); 20 C.F.R. § 404.1520b(b). Among an ALJ's options to address an evidentiary gap is to order that the claimant undergo a consultative examination. 20 C.F.R. §§ 404.1517, 404.1520b(b)(2)(iii), 404.1545(a)(3). Although the regulations confer upon the ALJ discretion to resolve evidentiary gaps, cases interpreting the ALJ's duty to develop the record have held that there are circumstances in which the ALJ *must* further develop the record. *Falksosky v. Comm'r of Soc. Sec.*, No. 1:19-cv-2632, 2020 U.S. Dist. LEXIS 165462, at *15-16 (N.D. Ohio Sept. 10, 2020).

In *Deskin v. Commissioner*, a court in this district reviewed an ALJ decision based on a record containing only one medical opinion from a state agency consultant who did not have the

13

benefit of two years' worth of subsequent medical records.  605 F. Supp.2d 908, 909-10 (N.D.

Ohio 2008).  The court stated that those facts created cause for concern that the ALJ's RFC was

not supported by substantial evidence.  *Id.* at 911.  With the principle that an ALJ may not

interpret raw medical data in mind, the court held that:

> [When] the transcript contains only diagnostic evidence and no opinion from a
> medical source about functional limitations (or only an outdated nonexamining
> agency opinion), to fulfill the responsibility to develop a complete record, the ALJ
> must recontact the treating source, order a consultative examination, or have a
> medical expert testify at the hearing.  This responsibility can be satisfied without
> such opinion only in a limited number of cases where the medical evidence shows
> relatively little physical impairment and an ALJ can render a commonsense
> judgment about functional capacity.

*Id.* at 912 (citation omitted; quotation marks omitted).  The same court later clarified that

"*Deskin* sets out a narrow rule that does not constitute a bright-line test.  It potentially applies

only when an ALJ makes a finding of work-related limitations based on no medical source

opinion or an outdated source opinion that does not include consideration of a critical body of

objective medical evidence."  *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 U.S. Dist.

LEXIS 122296, at *4 (N.D. Ohio Oct. 21, 2011).

Deskin has not been universally embraced by courts in this district.  *Adams v. Colvin*, No.

1:14CV2097, 2015 U.S. Dist. LEXIS 102588, at *39-40 (N.D. Ohio Aug. 5, 2015) (collecting

cases).  And to date, the Sixth Circuit has not commented on *Deskin* or its progeny.  *Sefo v.

Comm'r of Soc. Sec.*, No. 3:20-CV-00534, 2022 U.S. Dist. LEXIS 58234, at *9 (W.D. Ky. Mar.

29, 2022) (most recently remarking on the lack of Sith Circuit precedent).  Although *Deskin* is

not binding,[5] this court has held that *Deskin* and its progeny suffice to establish that "in some

circumstances, an ALJ *is* required to obtain a medical opinion in further once his 20 C.F.R.

---

[5] "District Court opinions have persuasive value only and are not binding as a matter of law."  *Liebisch v.
Sec'y of Health & Hum. Servs.*, No. 93-3122, 1994 U.S. App. LEXIS 6904, at *6 (6th Cir. Mar. 30, 1994)
(unreported).

§ 404.1545(a)(3) responsibility to develop the record." *Falkosky*, No. 1:19-cv-2632, 2020 U.S. Dist. LEXIS 165462, at \*15 (emphasis in original).  When *Deskin*, as clarified by *Kizys*, is implicated by the facts of the case, courts now distinguish from *Deskin* or, if they can't, remand for further record development.  *Compare, e.g.*, *Jay V. v. Comm'r of the SSA*, No. 3:20-CV-365, 2022 U.S. Dist. LEXIS 50564, at \*7-12 (S.D. Ohio Mar. 22, 2022) (remanding), *and Gonzales v. Comm'r of Soc. Sec.*, No. 3:21-CV-00093, 2022 U.S. Dist. LEXIS 49168, at \*26-34 (N.D. Ohio Mar. 18, 2022) (same), *with, e.g.*, *Jackson v. Comm'r of SSA*, No. 4:13-CV-929, 2014 U.S. Dist. LEXIS 73894, at \*19-26 (N.D. Ohio May 30, 2014) (distinguishing), *and Raber v. Comm'r of Soc. Sec.*, No. 4:12 CV 97, 2013 U.S. Dist. LEXIS 43428, at \*45-47 (N.D. Ohio Mar. 27, 2013) (same).

The ALJ applied proper legal standards in her determination of Reidenbach's RFC.  42 U.S.C. § 405; *Rogers*, 486 F.3d at 241.  Although Reidenbach has not framed her argument in terms of whether the ALJ's decision ran afoul of *Deskin*, that is what she has effectively argued in her initial brief.  And the cases upon which she relied, all analyzing whether a remand under *Deskin* is warranted, support that reading of her brief.  ECF Doc. 10 at 10-12 (citing *Gonzales*, No. 3:21-CV-00093, 2022 U.S. Dist. LEXIS 49168; *Hancock v. Comm'r of Soc. Sec.*, No. 3:20-CV-00376, 2022 U.S. Dist. LEXIS 45571 (W.D. Ky. Mar. 14, 2022); *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612, 2022 U.S. Dist. LEXIS 44167 (N.D. Ohio Mar. 11, 2022)).

Although there are some similarities, *Deskin* is not implicated on the facts of this case.  As in *Deskin*, the only opinion evidence in the record was that of the state agency consultants.  605 F. Supp.2d at 910.  The latest of those opinions was issued on September 22, 2019 and was based Dr. Mutchler's review of the medical record through September 13, 2019.  (Tr. 91-93, 98).  And between Dr. Mutchler's opinion (September 22, 2019) and the ALJ hearing (June 24, 2020),

there was nearly seven months' worth of additional medical records.  Although the temporal gap was not as great as it was in *Deskin*, that is not dispositive of whether *Deskin* applies.  The question is not the size of the temporal gap but whether the substance of the post-opinion evidence was "critical."  *Kizys*, No. 3:10 CV 25, 2011 U.S. Dist. LEXIS 122296, at *4.  Put differently, the key question is whether the post-opinion evidence was of the type that would *necessitate* a consultative opinion.  *Gonzales*, No. 3:21-CV-00093, 2022 U.S. Dist. LEXIS 49168, at *27 (citation omitted).

Regarding Reidenbach's knee impairment, the only pre-state agency opinion evidence of any lower extremity impairment was Dr. Cochran's August 9, 2019 treatment notes, which documented: (i) Reidenbach's subjective pain symptoms of bilateral knee pain, popping, locking, and giving way, all of which she treated with Tylenol; (ii) objective exam findings of joint tenderness; (iii) x-ray examination results of mild degenerative changes; and (iv) Dr. Cochran's recommended course of treatment – physical therapy.  (Tr. 493-94).

Reidenbach's post-state agency opinion evidence showed both improvement and worsening of her knee symptoms.  As evidence of improvement, there was: (i) Reidenbach's reports that she was "walking around a lot … because it felt good," and walking without her cane despite reporting 8/10 pain (Tr. 504, 539); (ii) her physical therapy discharge summary notes indicating that she achieved her physical therapy goals (Tr. 512-514); and (iii) the lack of: (a) subjective reporting of knee pain, and (b) remarkable lower-extremity objective exam findings in her post-physical therapy treatment notes (Tr. 577, 582-83, 602-03).

As evidence of worsening, there was: (i) her January 20, 2020 hospital discharge summary, indicating that conservative treatment had been ineffective, she underwent a knee replacement, and she was ambulating with a walker upon discharge (Tr. 524); (ii) her physical

therapy evaluation, showing pain (between 6-9/10 in severity), subjective reporting that her symptoms had been gradually worsening over the past year, and diminished strength and range of motion (Tr. 557, 559); (iii) physical therapy notes documenting her reports of pain, with her pain only reduced to between 3-7/10 in severity, and objective exam findings of altered gait and difficulty with endurance (Tr. 497, 499-500, 504, 506, 512, 516, 520, 526, 539, 548, 552); (iv) physical therapy notes documenting reports of right knee pain specifically (Tr. 526); and (v) Dr. Kepley's February 14, 2020 treatment notes, noting pain rated at between 7-8/10 in severity, that Reidenbach ambulated with a cane, and that she took Oxycodone for her pain (Tr. 543).

Although the evidence of Reidenbach's knee impairment post-dating the state agency physician reviewers' opinions was mixed, it showed, unlike *Deskin*, overall improvement in her lower extremity function. *Cf. Jackson*, No. 4:13-CV-929, 2014 U.S. Dist. LEXIS 73894, at *7-8; *Raber v. Comm'r of Soc. Sec.*, No. 4:12 CV 97, 2013 U.S. Dist. LEXIS 43428, at *17. The evidence also showed "relatively little impairment." *Deskin*, 605 F. Supp.2d at 912. By the conclusion of her physical therapy visits, Reidenbach no longer required a walker to ambulate, achieved near full strength and range of motion, and stated that she felt like "she can do everything she needs to do." (Tr. 512-14). Her only limitation was the inability to fully extend her knee. (Tr. 508). And she had returned to baseline activity levels, with no further reports of lower extremity pain. (Tr. 577, 582-83, 602-03).

The post-state agency opinion evidence of Reidenbach's knee impairment was also not of the kind which would implicate *Deskin*: "complicated diagnostic and/or highly-specialized medical data that requires professional training to interpret (e.g. MRIs, ultrasounds and other mechanized diagnostic testing)." *Chamberlin v. Comm'r of Soc. Sec.*, No. 19-10412, 2020 U.S.

Dist. LEXIS 81239, at *8 (E.D. Mich. May 8, 2020).  And contrary to Reidenbach's argument, there was sufficient evidence (summarized above) from which the ALJ could have determined her lower extremity function.  *See* (Tr. 26).  Thus, with respect to her knee impairment, the ALJ had no duty under *Deskin* to order a consultative opinion.

The same is true with respect to the post-state agency opinion evidence of Reidenbach's cardiovascular impairment.  The pre-state agency opinion evidence showed that: (i) before her first heart attack, Reidenbach reported shortness of breath and chest pain yet had unremarkable objective exam results (Tr. 277, 360-63, 391-92, 394); (ii) after obtaining initial relief with nitroglycerin, Reidenbach's symptoms returned and objective testing showed that she was having a heart attack (Tr. 277-78, 286-87, 299-300, 322-24); (iii) after her heart catherization, Reidenbach's left ventricle systolic function went from 30-35% to 56% ejection fraction, after which she did not report chest pain, and her objective examination results were unremarkable (Tr. 275-76, 286, 357-58, 367, 373, 379, 381, 463, 465, 472, 474, 585-86); and (iv) Reidenbach thereafter reported that she exercised at least 30 minutes per day and played with her grandchildren (Tr. 585).

Reidenbach's post-state agency opinion evidence was both limited and mixed.  Similar to her first heart attack, Reidenbach reported, among other things, chest pain and shortness of breath, but her objective examination results were unremarkable.  (Tr. 582).  As with her first heart attack, Reidenbach's condition worsened and she had another heart attack.  (Tr. 600-01).  And similar to the time after her first heart attack, Reidenbach reported episodes of chest pain which were effectively managed with nitroglycerin.  (Tr. 577).  But unlike the circumstances around her first heart attack, there was no objective evidence on the degree to which Reidenbach's heart function improved after catherization and stenting.  The only objective

evidence of Reidenbach's prognosis was the emergency nurse practitioner's belief that Reidenbach would regain function. (Tr. 600).

Other than Reidenbach's post-catherization restriction not to lift for one week, the post-state agency opinion objective evidence did not state what long-term functional limitations existed after Reidenbach's second heart attack. But given the emergency nurse practitioner's optimism and Reidenbach's subjective reporting (return to baseline physical activity, one angina episode, and relief with nitroglycerin), it was not unreasonable for the ALJ to conclude that this was evidence of "relatively little physical impairment." *Deskin*, 605 F. Supp. 2d at 913. And contrary to Reidenbach's argument, the post-state agency opinion evidence upon which the ALJ relied concerning Reidenbach's heart condition was not the kind of evidence that would necessitate an expert opinion to interpret. *Compare Chamberlin*, No. 19-10412, 2020 U.S. Dist. LEXIS 81239, at *8, *with* (Tr. 24 (regular cardiac rate and rhythm, with no extra sounds or edema and her treating physician's statements regarding Reidenbach's future condition)).

Although Reidenbach's claim of ALJ error is primarily a *Deskin* claim, several of her arguments remark on the lack of record development regarding her cardiovascular and knee impairments. But Reidenbach was represented by counsel during her ALJ proceedings. (Tr. 104). The ALJ, therefore, had no heightened duty to develop the record. *See Culp v. Comm'r of Soc. Sec.*, 529 F. App'x 750, 751 (6th Cir. 2013). This is especially true given that Reidenbach knew of outstanding medical records bearing on the severity of her cardiovascular impairment but did not submit them in support of her disability claim, her appeal to the Appeals Council, or her appeal to this court. *See Stemple v. Astrue*, No. 3:08cv00396, 2010 U.S. Dist. LEXIS 29156, at *23 (S.D. Ohio Jan. 8, 2010), *report and recommendation adopted*, 2010 U.S. Dist. LEXIS 13223 (S.D. Ohio Feb. 16, 2010). Reidenbach has not attempted to explain why those records

were never submitted or what those records might have shown.  *See Jackson v. Berryhill*, 268 F. Supp.3d 115, 133 (D. D.C. 2017); *Mahoney v. Comm'r of Soc. Sec.*, No. 1:19-cv-00946, 2021 U.S. Dist. LEXIS 53131, at *7 n.2 (W.D. Mich. Mar. 22, 2022).  And Reidenbach has not attempted to explain why she did not submit a treating source opinion.  *See Borden v. Comm'r of Soc. Sec.*, No. 5:20-cv-01391, 2021 U.S. Dist. LEXIS 148366, at *51 (N.D. Ohio Aug. 9, 2021). Although *Deskin* focuses on the ALJ's duty, Reidenbach's secondary arguments fail to recognize her role in creating the evidentiary gap which she claims is reversible error.  *See Jackson*, 268 F. Supp.3d at 133 ("In such a case, the ALJ is permitted to adjudicate a social security plaintiff's claim based on the record presented by her counsel and to assume that the applicant is making her strongest case for benefits." (quotation marks omitted; alterations omitted)).  On the record before the ALJ – and before this court – there is little evidence that the medical concerns about which Reidenbach is justifiably concerned have caused functional limitations that effectively prevented Reidenbach from working.

Upon careful consideration of the record, the court finds that the facts of *Deskin* are sufficiently distinguishable from those of this case to conclude that the ALJ did not commit a "*Deskin* violation" by not ordering a consultative opinion in light of Reidenbach's post-state agency opinion evidence.  Reidenbach has not demonstrated that the ALJ failed to apply proper legal standards or reach a conclusion supported by substantial evidence in how she determined Reidenbach's RFC.  And thus, the court finds no basis for remand.

**IV.     Conclusion**

Because the ALJ applied proper legal standards and reached a decision supported by

substantial evidence, the Commissioner's final decision denying Reidenbach's applications for

DIB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: August 2, 2022

Thomas M. Parker
United States Magistrate Judge

21